Citation Nr: 1331596 
Decision Date: 09/30/13 Archive Date: 10/02/13

DOCKET NO. 04-43 301 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Atlanta, Georgia


THE ISSUES

1. Entitlement to service connection for hypertension. 

2. Entitlement to service connection for inguinal and cervical lymphadenopathy.

3. Entitlement to service connection for the residuals of an upper respiratory infection to include chronic obstructive pulmonary disease (COPD). 

4. Entitlement to service connection for Guillian-Barre syndrome (GBS).

[The issue of entitlement to a total disability rating due to individual unemployability resulting from service-connected disability (TDIU) will be the subject of a separate decision]


REPRESENTATION

Appellant represented by: Georgia Department of Veterans Services


WITNESSES AT HEARING ON APPEAL

The Appellant and three relatives


ATTORNEY FOR THE BOARD

M. McBrine, Counsel


INTRODUCTION

The Veteran served on active duty from January 1973 to June 1978. 

The issues of service connection for GBS and residuals of an upper respiratory infection, as well as service connection for hypertension and inguinal and cervical lymphadenopathy (previously characterized as new and material evidence claims), come to the Board of Veterans' Appeals (Board) on appeal from a May 2004 rating decision issued by the RO in Atlanta, Georgia. The GBS claim arose from a June 2007 rating decision. These issues were previously remanded in January 2009 and March 2010. 

In June 2008 and July 2009, the Veteran testified at hearings conducted before a Veterans Law Judge (VLJ) and an Acting Veterans Law Judge (AVLJ), respectively. Transcripts of those hearings have been associated with the claims file. The law requires that the VLJ who conducts a hearing on appeal must participate in any decision made on that appeal, and that the matter will be decided by a three member panel of VLJs. See 38 U.S.C.A. § 7102 (West 2002); 38 C.F.R. § 20.707 (2013). The United States Court of Appeals for Veterans Claims (Court) recently held that a Veteran is entitled to have an opportunity for a hearing before all Board members who will ultimately decide the appeal. See Arneson v. Shinseki, 24 Vet. App. 379 (2011). An April 2012 letter was sent to the Veteran notifying him that he had the option of having a third hearing with a VLJ who would be assigned to the panel to decide his appeal. The Veteran was informed that if he did not respond within 30 days that he would be presumed to not want the additional hearing. The Veteran did not respond within thirty days. Therefore, in accordance with Arneson, an additional hearing is not needed.

The June 2008 hearing addressed only the issues of service connection for Hepatitis C, GBS, a disability resulting from an upper respiratory infection, to include COPD, and the issues of whether new and material evidence has been received to reopen claims of service connection for hypertension and cervical and inguinal lymphadenopathy (as characterized at the time). The July 2009 hearing addressed those five issues plus entitlement to TDIU. When multiple Board hearings are held as to some, but not all, issues on appeal, the issues not addressed at multiple hearings are docketed separately and decided in a separate decision. Board Chairman's Memorandum, No. 01-11-10 (May 12, 2011). Only those issues addressed at multiple hearings will be decided by a panel decision. Id. Thus, the Veteran's appeal as to entitlement to TDIU has been docketed separately from the remaining issues, and will be addressed in a separate decision. 

In January and September 2012, the Veteran submitted evidence directly to the Board regarding his appeal as to GBS. The Veteran did not waive consideration of the evidence by the agency of original jurisdiction (AOJ). 38 C.F.R. § 20.1304 (2011). However, the Board proceeded with adjudication as these issues were being remanded. The issue of service connection for Hepatitis C was denied in a November 2012 Board decision; that decision, and another November 2012 Board decision remanded the remaining issues for further development, and those issues now return again before the Board.

The issues of service connection for the residuals of an upper respiratory infection to include chronic obstructive pulmonary disease, and hypertension, are addressed in the REMAND portion of the decision below and are REMANDED to the RO via the Appeals Management Center (AMC), in Washington, DC.



FINDINGS OF FACT

1. The preponderance of the evidence is against a finding that the Veteran's previously diagnosed inguinal and cervical lymphadenopathy is etiologically related to a disease, injury, or event in service; the Veteran does not currently have inguinal and cervical lymphadenopathy.

2. The preponderance of the evidence is against a finding that the Veteran's Guillian-Barre syndrome (GBS) is etiologically related to a disease, injury, or event in service.


CONCLUSIONS OF LAW

1. Inguinal and cervical lymphadenopathy were not incurred in or aggravated by service, nor may they be presumed to be so incurred. 38 U.S.C.A. §§ 1101, 1110, 1131, 5103A, 5107 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.307, 3.309 (2013).

2. Guillian-Barre syndrome (GBS) was not incurred in or aggravated by service, nor may it be presumed to be so incurred. 38 U.S.C.A. §§ 1101, 1110, 1131, 5103A, 5107 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.307, 3.309 (2013).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Board has thoroughly reviewed all the evidence in the Veteran's claims file. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, all the evidence submitted by or on behalf of the Veteran. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (the Board must review the entire record, but does not have to discuss each piece of evidence). The analysis below focuses on the most salient and relevant evidence and on what this evidence shows, or fails to show, on the claim. The Veteran must not assume that the Board has overlooked pieces of evidence that are not explicitly discussed herein. See Timberlake v. Gober, 14 Vet. App. 122 (2000) (the law requires only that the Board address its reasons for rejecting evidence favorable to the Veteran).
 
Veterans Claims Assistance Act of 2000 (VCAA)

With respect to the Veteran's claims, VA has met all statutory and regulatory notice and duty to assist provisions. 38 U.S.C.A. §§ 5100 , 5102, 5103, 5103A, 5107, 5126 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102 , 3.156(a), 3.159, 3.326(a) (2013).

Under the VCAA, when VA receives a complete or substantially complete application for benefits, it is required to notify the Veteran and his or her representative, if any, of any information and medical or lay evidence that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b) ; Quartuccio v. Principi, 16 Vet. App. 183 (2002). In Pelegrini v. Principi, 18 Vet. App. 112, 120-21 (2004) (Pelegrini II), the Court held that VA must inform the Veteran of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; (3) that the Veteran is expected to provide; and (4) request that the Veteran provide any evidence in his or her possession that pertains to the claim. The requirement of requesting that the Veteran provide any evidence in his possession that pertains to the claim was eliminated by the Secretary during the course of this appeal. See 73 Fed. Reg. 23353 (final rule eliminating fourth element notice as required under Pelegrini II, effective May 30, 2008). Thus, any error related to this element is harmless. 

VCAA letters dated in February 2009, November 2012, and December 2012 satisfied the duty to notify provisions. See 38 U.S.C.A. § 5103(a) (West 2002 & Supp. 2012); 38 C.F.R. § 3.159(b)(1)(2013). The Veteran was advised that it was ultimately his responsibility to give VA any evidence pertaining to the claims. These letters informed him that additional information or evidence was needed to support his claims, and asked him to send the information or evidence to VA. 

Furthermore, even if any notice deficiency is present in this case, the Board finds that any prejudice due to such error has been overcome in this case by the following: (1) based on the communications sent to the Veteran over the course of this appeal, the Veteran clearly has actual knowledge of the evidence the Veteran is required to submit in this case; and (2) based on the Veteran's contentions as well as the communications provided to the Veteran by VA, it is reasonable to expect that the Veteran understands what was needed to prevail. See Shinseki v. Sanders/Simmons, 129 S. Ct. 1696 (2009); Fenstermacher v. Phila. Nat'l Bank, 493 F.2d 333, 337 (3d Cir. 1974) ("[N]o error can be predicated on insufficiency of notice since its purpose had been served."). In order to ensure that no prejudice resulted from a notice error, "the record must demonstrate that, despite the error, the adjudication was nevertheless essentially fair." Dunlap v. Nicholson, 21 Vet. App. 112, 118 (2007). 

In this case, the Veteran has been continuously represented by an experienced Veterans Service Organization or attorney and has submitted argument in support of his claims. These arguments have referenced the applicable laws and regulations necessary for a grant of service connection. Thus, the Board finds that the Veteran has actual knowledge as to the information and evidence necessary for him to prevail on his claims and is not prejudiced by a decision in this case. As such, a remand for additional notice would serve no useful purpose and would in no way benefit the Veteran. Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (remands which would only result in unnecessarily imposing additional burdens on the VA with no benefit flowing to the Veteran are to be avoided).

The Board also notes that, in Bryant v. Shinseki, 23 Vet. App. 488 (2010), the Court held that 38 C.F.R. § 3.103(c)(2) requires that the VLJ/Decision Review Officer (DRO) who chairs a hearing fulfill two duties to comply with the above the regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. Here, the VLJ and Acting VLJ that conducted the hearings fully explained the issues on appeal during the hearing, notably the elements for service connection and the evidence needed to substantiate service connection claims. Significantly, neither the Veteran nor his representative has asserted that VA failed to comply with 38 C.F.R. § 3.103(c)(2), nor has either identified any prejudice in the conduct of the Board hearing. As such, the Board finds that, consistent with Bryant, the VLJ and Acting VLJ complied with the duties set forth in 38 C.F.R. § 3.103(c)(2).

The Board also concludes that VA's duty to assist has been satisfied. The Veteran's service treatment records and relevant VA medical records are in the file. All records identified by the Veteran as relating to the claims have been obtained, to the extent possible. The Board finds that the record contains sufficient evidence to make a decision on the claims. 

The duty to assist also includes providing a medical examination or obtaining a medical opinion when such is necessary to make a decision on the claim. 38 C.F.R. § 3.159(c)(4)(i) (2013). In this case, the Board notes that the Veteran was provided comprehensive VA examinations in May 2010, October 2011, and December 2012. These examinations, taken together, were thorough, complete, and sufficient upon which to base a decision with respect to the Veteran's claims for service connection in terms of information as to etiology. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007) (when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate).

As there is no indication that any failure on the part of VA to provide additional notice or assistance reasonably affects the outcome of this case, the Board finds that any such failure is harmless. See Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other grounds, Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

Service Connection

Service connection may be established for disability resulting from personal injury suffered or disease contracted in the line of duty in the active military, naval, or air service. 38 U.S.C.A. §§ 1110, 1131 (West 2002 & Supp. 2012). That an injury or disease occurred in service is not enough; there must be chronic disability resulting from that injury or disease. If there is no showing of a resulting chronic condition during service, then a showing of continuity of symptomatology after service is required to support a finding of chronicity. 38 C.F.R. § 3.303(b). Service connection may also be granted for any injury or disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease or injury was incurred in service. 38 C.F.R. § 3.303(d).

Service connection for certain chronic diseases, such as certain neurological disorders, may be also be established on a presumptive basis by showing that such a disease manifested itself to a degree of 10 percent or more within one year from the date of separation from service. 38 U.S.C.A. § 1112 (West 2002); 38 C.F.R. §§ 3.307(a)(3), 3.309(a) (2013). In such cases, the disease is presumed under the law to have had its onset in service even though there is no evidence of such disease during the period of service. 38 C.F.R. § 3.307(a) (2013). 

In the absence of presumptive service connection, to establish a right to compensation for a present disability on a direct basis, a Veteran must show: "(1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service." Davidson v. Shinseki, 581 F.3d 1313, 1315-16 (Fed. Cir. 2009); Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

The standard of proof to be applied in decisions on claims for VA benefits is set forth in 38 U.S.C.A. § 5107(b). Under that provision, VA shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. 

The Board must determine the value of all evidence submitted, including lay and medical evidence. See Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006). The evaluation of evidence generally involves a three-step inquiry. First, the Board must determine whether the evidence comes from a "competent" source. The Board must then determine if the evidence is credible, or worthy of belief. See Barr v. Nicholson, 21 Vet.App. 303 at 308 (2007) (observing that once evidence is determined to be competent, the Board must determine whether such evidence is also credible). The third step of this inquiry requires the Board to weigh the probative value of the proffered evidence in light of the entirety of the record. 

Competent lay evidence means any evidence not requiring that the proponent have specialized education, training, or experience. Lay evidence is competent if it is provided by a person who has knowledge of facts or circumstances and conveys matters that can be observed and described by a lay person. 38 C.F.R. § 3.159(a). Lay evidence may be competent and sufficient to establish a diagnosis of a condition when:

(1) a layperson is competent to identify the medical condition (i.e., when the layperson will be competent to identify the condition where the condition is simple, for example a broken leg, and sometimes not, for example, a form of cancer);

(2) the layperson is reporting a contemporaneous medical diagnosis, or;

(3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. 

See Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007); see also Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009).

In ascertaining the competency of lay evidence, the courts have generally held that a layperson is not capable of opining on matters requiring medical knowledge. In certain instances, however, lay evidence has been found to be competent with regard to a disease with "unique and readily identifiable features" that is "capable of lay observation." See Jandreau v. Nicholson, supra (concerning a dislocated shoulder). Laypersons have also been found to not be competent to provide evidence in more complex medical situations. See Woehlaert v. Nicholson, 21 Vet. App. 456 (2007) (concerning rheumatic fever). 

Competent medical evidence is evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. Competent medical evidence may also include statements conveying sound medical principles found in medical treatises. It also includes statements contained in authoritative writings, such as medical and scientific articles and research reports or analyses. 38 C.F.R. § 3.159(a)(1).

After determining the competency and credibility of evidence, the Board must then weigh its probative value. In this function, the Board may properly consider internal inconsistency, facial plausibility, and consistency with other evidence submitted on behalf of the claimant. See Madden v. Brown, 125 F.3d 1447 (Fed Cir. 1997) (holding that the Board has the "authority to discount the weight and probative value of evidence in light of its inherent characteristics in its relationship to other items of evidence").

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107(b) (West 2002); see also Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

Taking into account all relevant evidence, the Board finds that service connection is not warranted for inguinal and cervical lymphadenopathy, or Guillian-Barre syndrome. In this regard, the preponderance of the medical evidence of record indicates that the Veteran's diagnosed GBS is not related to service, and there is no evidence of record indicating that the Veteran has inguinal and cervical lymphadenopathy, or any residuals thereof, since service.

The Veteran contends that his GBS, which was diagnosed in 2005, is secondary to a shot he received in service for a swine flu epidemic. The Veteran was diagnosed with GBS in 2005, and his service treatment records show that he received the New Jersey type A influenza vaccine on December 7, 1976. However, the preponderance of the medical evidence of record indicates that the diagnosis of GBS 29 years after the Veteran received a flu vaccine, is not related to service, to include that flu vaccine, and thus this claim must fail.

While the Veteran's service treatment records do show that he received a flu vaccine in December 1976, those records show no complaints of, or treatment for, GBS. In-service examinations in March and May 1978 show no complaints of, or treatment for GBS.

Social Security Administration records appear to show that the Veteran was found to be disabled as of September 1997, with a primary diagnosis of disorders of the back and a secondary diagnosis of somatoform disorders.

The Veteran received a comprehensive general VA medical examination in May 2010. He reported feeling leg cramps and weakness in his knees in 2005, and was shortly thereafter diagnosed with GBS, for which he has received intermittent treatment. On examination, the Veteran was noted to be confined to a wheelchair secondary to weakness in the bilateral upper and lower extremities. After a thorough examination and review of the Veteran's claims file, he was diagnosed with GBS, which caused significant interference with employment and activities of daily living due to muscle weakness. The etiology of the Veteran's GBS was reported as unknown.

Multiple VA medical opinions were obtained in October 2011. The examiner opined that the Veteran's GBS was not caused by or a result of his swine flu vaccination. The examiner indicated that the Veteran's claim that his GBS was related to his service swine flu vaccination was totally medically inaccurate. GBS is a disorder in which the body's immune system attacks the nerves. Weakness and tingling in the extremities are usually the first symptoms. These sensations can quickly spread, eventually paralyzing the entire body. There is no known cure for GBS, and the exact cause is unknown, but treatments can reduce the severity and duration.

The Veteran received comprehensive VA examinations for these disabilities in December 2012. At that time, the Veteran reported that he had cervical and inguinal lymphadenopathy in service, but currently had no lymphadenopathy, and was not undergoing treatment for lymphadenopathy. Upon examination, the Veteran was not found to have any findings, signs, or symptoms due to a hematologic or lymphatic disorder. Laboratory testing at that time was normal. The examiner concluded that the Veteran did not have any clinical findings of lymphadenopathy on examination.

For the Veteran's diagnosis of GBS, the Veteran noted that he had a swine flu vaccine, as well as a Hong Kong flu vaccine in service in 1976. The Veteran reported that he was first treated for GBS in 2005, but was not currently under any specific treatment for GBS. The Veteran reported intermittent pain in all of his extremities, as well as paresthesias and numbness in the lower extremities. Muscle strength upon testing was noted to be reduced in all extremities. Muscle atrophy was noted in the gastrocnemius. Reflex examination showed diminished reflexes in the ankles. Sensory testing showed decreased sensations in the lower legs and feet. The Veteran's gait was noted to be ataxic with a limp on the left side, and was attributed to residuals of GBS. Testing showed severe problems with his sciatic nerve. The Veteran was noted to use assistive devices to walk, due to the residuals of GBS, as well as a fall from a scaffold which injured his back, pelvis, and neck.
Upon examination and review of the records, the examiner concluded that the Veteran's GBS was not related to service. In support of this opinion, the examiner noted that the Veteran had a normal neurological examination upon separation from service. It was noted that the Veteran received a flu vaccine in December 1976. According to a treatise titled "Influenza vaccination and Guillian Barre Syndrome" Clinical Immunology 107 (2003) 116-121, the median onset for Guillian Barre following an influenza vaccine is 12 days, with a range of 7 to 21 days. The Veteran was documented to have developed GBS 29 years after he received a flu vaccine in service. There is no documentation of symptoms of GBS in the Veteran's service treatment records. A treatise entitled "Do vaccines cause GBS?" in the Journal of Epidemiology documented that the median onset interval for GBS was 13 days. Post service, a doctor noted that the Veteran developed diarrhea, nausea, and vomiting for over a week with the development of an ascending weakness which began on September 21, 2005. The examiner noted another medical article which indicated that GBS and vaccination were usually unrelated, and indicated that most cases of GBS are triggered by a bacterial or viral illness. The examiner therefore concluded that the development of GBS in the Veteran in September 2005 was most likely related to a recent virus, and not his in service swine flu vaccine 29 years prior.

Thus, the preponderance of the evidence of record indicates that the Veteran's GBS is not related to service, but rather is most likely related to a post service virus contracted shortly before onset of GBS.

The Board notes that the Veteran has repeatedly, in his hearing testimony dated June 2008 and July 2009, and in his statements to the Board, stated that because GBS has a statistical relationship to the administration of a swine flu vaccine, because he was given that vaccine, and because, at a later date, he was diagnosed with GBS, that this shows the causation required for the grant of service connection. To help the Veteran understand more clearly why his claim has been repeatedly denied, the Board will attempt to explain as clearly as possible why a potential statistical correlation does not equate to causation in this case. First, the Board notes that some of the treatises medical examiners have cited appear to show there is no correlation between the administration of that particular vaccine and GBS. However, there are some studies, such as one dated 2011 from the Centers for Disease Control and Prevention, which indicate there might be an extremely small (1 additional case per 100,000 dose administrations) increased risk of incidence of GBS for those people that received the swine flu vaccine. Even without considering the time of onset of GBS, the Board is of the opinion that a minute statistical correlation suggests only a very remote small chance of causation. Even considering this small chance however, the Board remanded this claim for a medical examination, for the tiny remote chance that the Veteran's GBS and swine flu vaccine were somehow related. However, not only did the medical examination of December 2012 render a negative opinion, it pointed out for the Board's benefit that, if a vaccine caused GBS, the onset would be no later than, at the very most, a few weeks after the vaccine was administered. As well, none of the treatise evidence cited by the Veteran, or any medical professional, indicates that it is possible for GBS to occur as a result of any vaccine or virus any more than several weeks after the vaccine or virus was acquired, let alone 29 years after the administration of the vaccine or the occurrence of a virus. The evidence does not show, nor does the Veteran appear to allege, the onset of GBS any earlier than 2005. Therefore, all the medical evidence of record, including medical opinions, 
and medical treatises, indicates that, even though the Veteran might have been very slightly more likely to acquire GBS after the administration of his swine flu vaccination, that GBS related to the swine flu vaccine would have had to manifest no later than, at the extreme, one month after the administration of the vaccine. This evidence simply does not show this to be the case. Every piece of medical evidence of record is in agreement that the Veteran's GBS, which manifested in September 2005, must be related to some incident that occurred no earlier than August 2005, likely a virus.

The Board does not doubt that it is the Veteran's sincere and honest belief that his GBS is related to his vaccine in service, and the Board does not doubt that the Veteran was diagnosed with GBS in 2005. However, as explained above, the preponderance of the evidence of record is against a finding that the GBS is related to a 29 year old vaccine administration. The Board cannot substitute its medical judgment, and must rely on the medical evidence of record, which clearly indicates that the Veteran's diagnosis of GBS is not related to service.

As to the Veteran's claim for inguinal and cervical lymphadenopathy, the Veteran's claim for this disability appears to be based on his belief that it is secondary to his GBS. As service connection is not being granted for GBS, service connection for this claim cannot be granted on a secondary basis. However, the Board also points out that there is no evidence of record linking this claim directly to service. For his claimed inguinal and cervical lymphadenopathy, while service treatment records show that the Veteran was seen twice in August 1975 in service, for enlarged lymph nodes that were felt at the time to be secondary to dermatitis, there is simply no evidence that the Veteran currently has this disability, or any residuals thereof. Notably, this is not a disability that is capable of lay observation (unlike, say, tinnitus or varicose veins) as it involves lymph nodes. Further, no medical evidence is of record linking this disability to service in any way. Thus, with no medical evidence having been presented relating this disabilities to service in any way, and no evidence having been presented to show that the Veteran had any post service diagnosis of inguinal and cervical lymphadenopathy or any residuals thereof, the Board finds that the preponderance of the medical evidence of record is against a grant of service connection for these disabilities on a direct basis as well.

As the preponderance of the evidence is against both of these claims, the benefit-of-the-doubt doctrine does not apply, and the claims must be denied. 38 U.S.C.A. § 5107(b) (West 2002); Gilbert v. Derwinski, 1 Vet. App 49, 55-57 (1990).


ORDER

Entitlement to service connection for inguinal and cervical lymphadenopathy is denied.

Entitlement to service connection for Guillian-Barre syndrome (GBS) is denied.


REMAND

As to the Veteran's claims of entitlement to service connection for hypertension and a respiratory condition, the Board regrets that a further remand is required. While the Veteran claimed these disabilities primarily as secondary to GBS, the Board notes that it is required to consider all theories of entitlement, and therefore, in a November 2012 remand, the Board requested that the Veteran receive VA medical examinations for each of these issues, and that the examiner provide not only opinions as to whether these conditions were related to GBS, but also whether they were directly related to service. While the Veteran did have examinations for both of these conditions in December 2012, the examiner did not offer an opinion as to whether these conditions were directly related to service.

A remand by the Board confers on the Veteran, as a matter of law, the right to compliance with the remand orders. Stegall v. West, 11 Vet. App. 268, 271 (1998). Where the remand orders of the Board are not complied with, the Board itself errs in failing to ensure compliance. Id. As such, the Board finds that this case is not ready for appellate review and must be remanded for compliance with the remand instructions, specifically, opinions from the VA examiner who saw the Veteran in December 2012, or from a new examiner if that physician is not available, as to whether these conditions are directly related to service.

Accordingly, these claims are REMANDED for the following action:

1. The Veteran's claim file must be returned to the examiner who conducted the December 2012 VA examination, for a further opinion regarding the Veteran's claimed respiratory disorder and hypertension. If that examiner is not available, the Veteran must then be provided with additional VA medical examinations for both his claimed respiratory disorder and hypertension, with an examiner who has reviewed the claims file (including any relevant evidence in Virtual VA). The examiner(s) must provide an opinion as to whether it is at least as likely as not (a 50 percent or greater probability) that the Veteran has either hypertension, or any respiratory disorder, etiologically related to service. All opinions must be supported by a complete rationale in a typewritten report.

2. Then, the RO/AMC should readjudicate the claims on their merits. If the benefits sought are not granted, the Veteran and his representative should be furnished a Supplemental Statement of the Case and afforded a reasonable opportunity to respond before the record is returned to the Board for further review.

The Veteran has the right to submit additional evidence and argument on this matter. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This appeal must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2012).



 ______________________ _______________________
 ALAN S. PEEVY K. MILLIKAN
Veterans Law Judge Acting Veterans Law Judge 
 Board of Veterans' Appeals Board of Veterans' Appeals


_______________________
 A. C. MACKENZIE
Acting Veterans Law Judge, 
Board of Veterans' Appeals

Department of Veterans Affairs